Case number 215704 Christopher Anderson et al. v. City of Jellico, TN Argument not to exceed 15 minutes per side. Mr. Nelson, you may proceed for the appellants. Good morning. Thank you and may it please the court. Your honors, we are here on a First Amendment retaliation claim. In the seminal case of Pickering, the Supreme Court set forth the factors that have to be balanced in deciding whether public employees who speak are entitled to First Amendment protection. Since Pickering was decided, the Supreme Court on numerous occasions, as well as every circuit court and obviously including this court, has taken occasion to further define what the factors set forth in Pickering actually mean as applied to numerous scenarios, particularly when we talk about whether the employee speaks as a citizen or whether the employee is speaking in his or her capacity as an employee. It was on that first issue that the district court in our case ruled that Police Chief Chris Anderson and Deputy Chief J.J. Hatmaker spoke as employees and not as citizens. It is on that issue, your honors, that we respectfully submit that the district court erred. The point of Garcetti is to get out from under Pickering balancing, right? So you are kind of starting with the whole Pickering balancing stuff and Garcetti says don't worry about it if they are speaking as employees. And I believe Garcetti tweaked Pickering to get out from under it, as your honors would say, but I believe what Garcetti actually also did was sort of further clarify the distinction or what it means to be speaking as an employee. And so in that context, your honor, Garcetti supports our position. Garcetti clarified, as did Lane that came after that, that employee speech is not speech made by an employee, as I think it would seem to suggest, right? If you speak and you are an employee, it is employee speech. What Garcetti and Lane further clarified is you look at the ordinary duties of the particular job in comparison with what the context of the speech, which is look at the record as a whole, right? You don't isolate, you don't chop up the speech, you look at the record as a whole. Why weren't they speaking as employees? They were wearing their uniforms, they brought their guns, they spoke during the police portion of the meeting, they talked about the police department itself and the hiring and other things. Why isn't that? So I do disagree with a few assessments there, Judge LaParte. So with respect to bringing their guns, I don't believe that's accurate or in the record. I believe the phrase is they were in their uniforms, but as we've pointed out, they were not on duty. There is a schedule shift, so they were not on their shift. Can I just on the uniform point, because I'd like you to keep responding to Judge LaParte's question, but just on the uniform point, so khakis, polo shirt, did the shirt, for example, have an insignia about it? I believe it did, Your Honor, yes. And the insignia would have said the police department? I believe it did, yes. Okay, so that it's khakis and polo doesn't mean anything. It's still uniform, right? I believe so, and I believe that is a fact that if Your Honors want to say that wearing the uniform places them as speaking as an employee? I think you're right. It's a bunch of factors. I'm not saying there's only one, but I wasn't sure whether their insignia, that's all I wasn't sure about. So I'll keep answering his question. Okay, yes. So to your point, Judge LaParte, yes. Do they have a badge? No, it's on their shirt. It's the insignia. It's the insignia, so they're wearing khakis and a polo. The record evidence shows that neither man was on their shift. It was after hours. Chief Anderson had left three and a half hours earlier. So again, Your Honor, as the court indicated, you know, well, they Didn't they customarily go to these meetings? So hit and miss. There was no requirement to be there. If they did go, they didn't Well, tell me what I'm missing. I thought I'm remembering from the record that there was always one of them there for the, I don't know, the police, the law enforcement part of the meeting. Is that just wrong? I believe if it is a fact, it was a sort of by happenstance, right? So generally we were there. One of us was there, generally. Not necessarily to speak, and in fact, the record doesn't have any indication that they ever did speak at these meetings before. And in some other facts that we would suggest otherwise, if they had an issue, they would just go to a council member individually, for example, if they needed something or had a question. In fact, Sandy Terry testified that just in those few weeks from when she took office to when this meeting happened, Deputy Chief Hatmaker stopped by her office. I think she worked at a pharmacy or something. Stopped by her office on several occasions because she had indicated they had essentially taken over the department, which is true. And so any time there had to be a decision made, he would kind of have to go to her and sort of ask these questions, not in the context of a public meeting. So, no. And again, as we mentioned, the fire chief was also involved in some of these decisions. He wasn't there. When the question was posed of, well, does the fire chief need to give input on these decisions, Mayor Osborne said no. So there was no requirement that they be there. They were not there to provide security. There was another officer on duty. It was outside of their shifts. And so to your point, Judge Sutton, if they had insignia, I don't believe they had a gun. I can't say they didn't, but I don't believe the record says they did. How do you respond to this part of what was going on? This, I suppose, leans me towards thinking it's Garcetti covered, but I perhaps could see the other side of it. If you think about what was going on, and obviously these folks were not getting along, we're basically having a turf war over who's in charge of the department. And people are asserting their authority. People are trying to push back. On the one hand, you could say, well, that's kind of public interest-y, who's in charge of the police department. But when people are speaking in their uniforms at a council meeting and asserting, well, we don't have this or I'm going to quit, it does seem to be in your capacity as an employee, like, I'm going to quit if you're not going to let me do these types of things as an employee. So how do you respond? I mean, it does seem like a turf battle, right, as to who's in charge. So it does, Your Honor, but again, I've got to disagree with your characterization of it. I don't believe that's at its core what it is. Chief Anderson had been there for 21 years at this point. He had worked through several mayoral administrations, various trade-overs of city council members. This is a position that sure, I mean, different city council members are going to come in and they're going to want certain things or want certain things done their way. There's going to be, as Your Honor said, there's going to be the upper people sort of saying how the police department should be run. In fact, the mayor in his December 21st meeting did discuss these things, like for example, the uniforms. He did not like the khaki and polo uniform selection. He wanted more formal uniforms. They discussed issues of police department patrol cars, which ones are being used, which ones are marked as undercover. So these are the things that just happen. These are things. Chief Anderson and Deputy Chief Hatmaker never raised an issue, not one, about those types of matters. And so it's not a who's going to control the police department in as much as it's these are the decisions he has put out. These are endangering people and it's violating the charter and the process. And so what J.J. Hatmaker said, for example, is if you, meaning the board, want to have it this way, then that's fine by all means. Take a chance, vote. But this is endangering the public safety and it's exceeding his lawful authority. And that's where, Your Honor, I don't agree with your characterization that it's a turf war of who's going to control the police department. They can control the police department. They just can't do it in a way that's unlawful, number one, which was confirmed. Why are they not speaking in their capacity as employees when they say, well, if you don't have two people on the beat, you can't simultaneously police the community and bring people in when you arrest. That's an employee perspective. I mean, that's why people are listening to them. They're the ones that have something to say about public safety. And you think you're just focused, I mean, not just, you're focused on the fact that it's a public interest point. But I just don't understand how you would say they're not speaking as employees. That Your Honor, that is exactly, I think your assessment right there is exactly right and it's exactly why the courts say that this type of speech is the zenith of First Amendment protection. When they're speaking as employees? No, Lane v. Franks, for example, says that employees who get this type of knowledge, because the board had no knowledge of any of this stuff. Lane v. Franks speaks directly to this point. When they're talking about hiring decisions, how they have to be involved, weren't they talking about that? And the manual, I mean, you say they don't speak at this, but the police manual says that they have, what, provide advice to the board and the alderman, a mayor and an alderman, on matters pertaining to the police department. So why isn't that? And then they've got a police session. I mean, it seems to me a lot of what they're doing is in their role as police officers. Your Honor, and the fact you made about the manual, that's probably the most harmful fact for us. But I believe we've addressed it in the brief in the sense that, first of all, and this is a little bit of an aside, the city asserts and the mayor asserted that his many other things that would demonstrate that he was exceeding his lawful authority. Because that manual, in addition to what Your Honor read, says all of these other things that the chief does this, the chief does this, the chief does this. So if that's binding, then he is absolutely exceeding his lawful authority. One hundred percent. So the mayor says, well, the charter or the municipal code or whatever trumps that. So it's a little bit difficult to say, well, you're right, that's a harmful fact, when the city all along is saying, yeah, well, that doesn't really matter, that it's been overruled by the municipal code, the charter, whatever. Can I ask you one other question? I thought you said in response to the chief that there, to Chief Judge Sutton, that there is, he doesn't regularly attend the meeting. But I saw on the record, like 303 and 379, and maybe you can clarify it for me, that Anderson usually attended the meetings to weigh in on items involving the police. I don't believe, I believe, two different points there. He does regularly, one of them, somebody from the police department, whether it be the chief, the assistant chief, or maybe even somebody else, but I believe Chief Anderson said yes, he does regularly attend to say weigh in on matters of the police department is where I don't believe the record supports that. He does attend. And so if I indicated in response to Chief Judge Sutton that he Maybe I misheard you. Then I misspoke if I indicated that. Because no, he does attend or Deputy Chief Hatmaker does attend. But they were not on the agenda. This was not a I see your light's on, so if you want to keep going, you can. Otherwise, we'll give you all your rebuttal. Very good. Thank you, Chief. Thanks so much. We'll hear from Ms. Vogel. Good morning. Good morning, Your Honors. It's a pleasure to be here before you and an honor to be here on behalf of my client in the Appalachian City of Jellicoe. Your Honors, I believe you've touched exactly on where I was going to start, which is Garcetti is absolutely controlling in this case. We have employees speaking in that capacity. Why did they have to suspend the rules for them to speak? I believe and the way I understand the way that they operate their meeting is if you unless you proceed under the grievances from citizens portion, you have to either be specifically asked to be put on the agenda. And if you're not, then the only persons that can initiate discussion can be the board members. And so I believe the mayor's perspective was they had not been properly recognized. Didn't they testify that they were too late to testify in the citizen perspective, which is where they wanted to speak or something to that effect? I believe their testimony was, well, I wasn't sure if it had already occurred. Maybe I missed that part or not. I don't know if it was a deliberate decision for them not to speak during that point. They don't usually speak during the police period. I don't think there's proof in the record that there is, if you want to define usual, that that's something that they typically do necessarily. But they, like your honors brought up, they were in fact addressed during that portion. And specifically, well, we'd like to hear from the officers on their perspective about a certain police department issue. What facts would make this different? I mean, you have the police chief and assistant who are very concerned for the public because of changes that have been made. So what would make it not speech as an employee in that context? Well, your honor, I respectfully disagree that their intention or their impetus or even the context of their speech was that they were very concerned about the public. Well, then let's regard it as a hypothetical. Okay, sure. So I think had this not been presented as, in my opinion, this is being presented as I have a job responsibility and those responsibilities are to schedule officers, to hire officers, to patrol the streets, to manage this department. Those are my job responsibilities. And my superior, someone that I'm working with, is interfering with my capacity to do that. And so it's like the Haynes case or the Mayhew case where that is what they're complaining of. If someone is micromanaging me and therefore interfering with my ability to perform these duties. And so I think if it had not been coached in those terms, which is what their complaint was, you're interfering with me, my ability to do my job. This was not, and I would say it may be different if there was actual proof in this record that someone was in fact doing something illegal. That it maybe would have taken it out of this realm like in Haynes or Haynes discusses this where, you know, you're just speculating that a discretionary decision or a decision made by the mayor may ultimate or may somewhere down the road lead to some unfortunate consequence to someone in the public which may ultimately lead to a lawsuit and so forth and so on. But anything short of that, you're just, you know, you're just saying well I really have an issue with the way, you know, I've always done it this way and the mayor comes in and he's telling me to do it a different way. You're micromanaging me and you're interfering with my ability to do my job responsibilities. That's all we have. There's not a separate component or proof that no, this was in fact something illegal. And I think that would have made a difference here because I think that's kind of what Haynes gets to. But anything short of that, it's just, you know, please, you know, I want to do my job this certain way and from my perspective in law enforcement this is how I think it should be done. I don't think you should be nervous about the possibility that they're speaking about public safety. I mean that is the whole point of Garcetti. You take a topic that clearly is covered by Pickering and Connick, the public interest, and they are after all public employees, in this case law enforcement, and so almost anything they talk about is potentially going to be an issue of public concern and public interest. So that just strikes me as always being on the table and not the real point and that's why I think we're supposed to try to figure out the capacity, the impetus and all of that of why they're speaking. I realize those aren't the brightest lines, but I think it always concerns public safety. And it's easy as law enforcement to make anything, even if it's tangential or incidental to what you're talking about, I mean, that's an easy position to take. And if it's even easier to do it in hindsight, of course. But, you know, you kind of look at the greater context of this and you think, well, you had a meeting in December where the mayor clearly set forth perhaps his perspective changes or maybe even implemented them some at that time. And then we're talking a month later, you know, if these concerns were so grave to the public and all this stuff was happening, I mean, nothing was even mentioned or done or brought to the attention of the mayor or this council or the police and fire committee in that interim. It was not until this public hearing where we heard all these grievances. What do you say about this, which does seem to me quite artificial about how these cases work. So now we have the very shrewd police chief who's read decisions, maybe even a decision you win and they go, okay, I guess this is how it works. I got to not wear my uniform, no gun. I've got to be very explicit. I'm speaking during the citizens part of the meeting and then I get up there and I say, well, yeah, I just want to talk as a citizen here. Now turns out I'm also police chief, but I'm really talking as a citizen. And I just want you to know if we go to this operation where we have fewer folks, less overtime and all these other changes from city council, people are going to die. And so that's, and then he's fired. And at that point you say, well, he didn't have the uniform, didn't have the gun, he explicitly spoke during the citizen part. That case comes out differently, I take it. I would say so, yes, your honor. And I don't think that's a practical, you know, I don't think that that's the way people operate and it's, you know, but I don't necessarily think... Why don't people, people, I think it's completely the opposite. People look at incentives and we would create the incentive. This is easy enough. Well, it could be. I mean, people could understand that, but I guess at the time, I don't know if people are that calculated to think through these things. Have I checked off my list to make sure I know what position I'm speaking in and, you know, everybody understands why I'm here and whatnot. And that's why I think looking at everything in the context, including the uniform, including, but as your honor mentioned, I mean, everything they spoke about was their perspective on things from law enforcement. I mean, that's why they were asked to even, that's why they were asked during the police and fire committee portion of this meeting was we specifically want to hear from these officers on hiring this person. I mean, that's the crux of, that's the crux of Garcetti. You know, whether or not this had happened a hundred times before, maybe not, but that's what happened on that day. And I mean, if we look at the actual content, I mean, it is, TURF War is a perfect way to explain it. I mean, we have Chief Anderson saying, like I said, we've got 47 months to go and it's just not going to work between me and the mayor. It's that plain and simple. And then you have Chief, or Assistant Chief Hatmaker. I just want to tell you, you can't micromanage a police department. I mean, that, that, that's what this was, that's what this was about. And again, back to the Haynes and Mayhew, I mean, if, if it's part, if you're, if you're an employee speaking about your job responsibilities, and particularly when you're complaining that someone is interfering from you performing those responsibilities, then that's not protected speech. Didn't the mayor object to them speaking because he said it was outside of the grievance, citizen grievance time? So... I think, I think his point was, if, if you're just going to speak freely, that portion can be done during the citizens from grievance section. Otherwise, you have to be specifically addressed by the board. They have to, they have to, you know, pass a motion in order for you to address the board. And when he testified in his deposition that they came in to, I don't know, he said something like intimidate, and they brought their guns and all, was he wrong? About the intimidation or about the guns? Both. Both. I would agree with Mr. Nelson. I don't think that there's proof in the record as to whether or not they, in fact, have their guns or not. So, I mean, I guess... If they're coming in to intimidate, I mean, does, which way does that cut in your mind? That they're acting as police officers or citizens? To me, to me it, as police officers, well, as employees, but I think it more goes to the beef of this whole situation. I mean, this is an extremely rural city, right? I mean, the whole police department, I mean, there's eight people on the roster at the time, right? Mayor also, everybody knows everybody. Mayor's been, City of Jellicoe, he worked for the police department years ago. I mean, these, you know, this blood goes back some time. I mean, these aren't people that don't know each other. And that's why, you know, it's very, it cuts very deep when you have people that have done something a certain way for a certain time. And then a new mayor comes in and tries to do something different. And that also goes to why this is employee speech. And it's not a matter of public concern because there was so much discussion on, and even in the briefing, well, this was a new, this was the new mayor, right? Don't come into my turf and tell me what to do. And this is the way we've always done things. And in fact, we're the only, you know, this is the way the Jellicoe Police Department's been run all this time. This is the way other departments run. I mean, that's all speech pertaining to your law enforcement perspective. Not only as an employee of that department, but as a police officer in general. So you said before, well, it might be a little different if they were speaking about illegalities? I guess if there's evidence as to that, your honor. Right. Well, no, I'm just trying to, I'm trying to sort out how that works. You know, we had this case from, I think it came out of Cleveland, but it was a magistrate judge who was complaining about how warrants were being issued. And arguably that had an illegality point to it. Like, I think that was the, that was the beef. The beef was you're doing this illegally, not consistent with the fourth amendment. And so I'm trying to figure out exactly how this works, because that's, that's also stuff you're going to intimately know from working there. And that seems to support the idea you're speaking as an employee. In the back of your mind, you're thinking there has to be room for whistleblowers. No one wants to take that on. But I don't know. I just, and the more I think about this, the harder it gets. I understand your honor. And that's why, and that's why I keep, I keep thinking about the K-9 chief who is complaining that essentially funding for the K-9 program has been cut, right? And so you're going to have a reduction in training of these K-9s. And so he speaks out and says, listen, you know, a reduction in K-9 is, you know, could absolutely lead to bad outcomes, right? Your K-9 acts improperly, which could lead to a lawsuit and so forth and so forth. And that's where the court, where this court focused on, you know, you have, you're speaking as an officer and your perspective on it and you're communicating those concerns to your superiors. And the problem is, is that, excuse me, in that case they said this was all speculative, right? There wasn't actually anything currently happening or actually, I believe their words were, there wasn't anything illegal as it stood as, you know, the training that they were cutting wasn't bringing it below the brink of what was an acceptable training by statute or... Well, I guess I'm finding myself in the same territory as Chief Judge Sutton. I mean, so if it falls below a certain line, then it's protected? I mean, if the thing you're complaining about is bad enough, it could be the same thing, but if a month later the dog bites someone, then the speech is protected? Well, I think it could go more to the context where you don't have proof of anything actually being done illegally or wrong and it's more of a speculative thing in nature, right? Like these things could happen. For example, here if you have less people patrolling on this shift, well then maybe things could happen there. But when it's something short of that, you're just, the context is then you're just unhappy about the decision that's been made, right? You have a disagreement with the way your superior is handling a situation and you may handle it differently. But, you know, the employer has not made a decision that's illegal. It's, you know, taking one person off of a shift during daytime doesn't make anything about that illegal. It may not be what the appellants thought was proper, but it doesn't make anything illegal. And so under those circumstances, it's too speculative and it's just viewed as a disagreement between... It didn't address the illegality. There was no, as I understand it, the analysis did not include an assessment of who actually had the authority. I agree with that, Your Honor. I think it just, I think it more all goes back to are we looking at, are these complaints fundamentally just disagreements between how this department should be run or are they truly as a matter of public concern and speaking as citizens? And I think that whole analysis and hangings and whether something that's being alleged is in fact illegal, is there proof that it's legal or is it just, listen, this person, you know, has made a decision that I don't necessarily agree with and maybe it's interfering with my ability to do my duties. Thank you. We'll hear from Mr. Nelson. Your Honor, a couple of points. As to the illegality, the record is clear. The city attorney, after doing the research, concluded that what the mayor was doing was a legal overreach. It was illegal. He overreached. And so I believe that solves the illegality issue. It was illegal for him to... What about the case I mentioned? This court just decided about the magistrate. The magistrate's concern was that the warrant process was not consistent with the Fourth Amendment. And if that, it was illegal, and I believe... Well, you may not have read the decision, but the decision applied Garcetti to the speech. Right. And Garcetti, Your Honor, is against, Garcetti supports us. Garcetti says if the district court's opinion was correct, they can control the message. Decrane and others like Decrane have recognized that when there's almost a pushback against the government speech, it tends to favor citizen speech because, of course, it's not commissioned. They're disagreeing with something that the government has spoken on. Garcetti supports our position on this, Your Honor. Decrane could not exist if the district court's opinion was correct. Lane v. Franks could not exist if the district court's opinion on this issue were correct. They're incompatible. They're inconsistent. As to the other issues that haven't been addressed, if you want to look at, is this an employee beef? Are they mad at the control? You have to consider that they did speak to the district attorney about this, who had zero authority over any type of employment issue, any type of who controls the police department. None of that. Doesn't their speaking to the district attorney suggest the employment point? It does not. Well, just hear me out on this. It seems to me, whether it's MTAS or the district attorney, those phone calls are being returned because they're police officers. Again, that triggers the assessment in Lane that it has to do with commissioned speech. Is that ordinarily a part of their job duties, to contact MTAS, for example? That's what the Lane v. Franks is explicit that the assessment is, or the analysis is, is that ordinarily part of their job duties. It's just not. It's not even close. Reaching out to the district attorney to say, hey, he's talking about arresting homeless people ten times a day and these sorts of things. That's not a personnel beef. The DA has no control over it. I thought police officers, in fact, I'm really hopeful that police officers talk to district attorneys and entities like MTAS all the time. That would make our job a lot easier. These do not. These do not. Particularly not about ... Not because they're not allowed to. I don't know why they're not talking to them, but this is a normal way this law enforcement works. The officers talk to the attorneys because the attorneys are the ones that do the indictments. That's a pretty frequent channel of communication. Were they speaking as the government commissioned them to speak to the DA, such as in Garcetti, for example? That was his job, was to prepare these memoranda and give input as to whether the affidavits were proper. That's not what we have here. With reaching out to MTAS, it's something that is a ... Maybe it addresses or bumps up on, yes, they perform their job, but is that government speech? Is that speech that the government is paying them to engage in? Absolutely and unqualifiedly, no, it's not. Well, then, any conflict isn't covered? Any conflict of what, Judge White? If the standard is, were you hired to, or was this part of your job to speak this way, anything that's going to lead to adverse action is likely to be able to make that argument that you weren't commissioned to speak that way. And that's, I think, at least in part, what declined the arrest. I'm following up on the same question, the same point. I'm a citizen in Jellicoe. I hear about this idea of dealing with homelessness by just arresting homeless people. I'm like, gee, that doesn't sound right. I called the district attorney. The district attorney, the district attorney might return my call as a citizen. I'm not a police officer. He might, but I can't believe the district attorney has an obligation to answer the question, can the police be arresting homeless people as a way to deal with homelessness? By contrast, I'm quite confident the district attorney is expected to, doesn't have an obligation to respond to the police chief's question, can we do this? And that's not commissioned to do it. There wasn't some act by a superior, say, go ask this question, but it's clearly within job responsibilities. And MTAS, I got to expect, is exactly the same way. They might as a service take a citizen call, but if it's something as involved as this, like the legality of arresting homeless people, I'd be shocked if district attorneys were saying, well, yeah, we'll answer any phone call from anybody on this. Whereas they are answering the phone calls from police officers. And I think that inference is reasonable. I can't say that it's incorrect. I don't believe that it can make speech that is not an ordinary part of the job become part of the job. Okay. I think we've got it. Okay. Thank you very much. Thank you. Thanks to both of you for your helpful briefs and arguments. We appreciate it.